# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

———————

m 01-50711

———————

MARY ROE,
INDIVIDUALLY AND AS NEXT FRIEND OF JACKIE DOE, A MINOR CHILD;
JOHN DOE,
AS NEXT FRIEND OF JACKIE DOE, A MINOR CHILD,

Plaintiffs-Appellees,

VERSUS

TEXAS DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES, ET AL.,

Defendants,

BEVERLY STRICKLAND,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

July 17, 2002

Before REAVLEY, SMITH, and DENNIS,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Mary Roe and John Doe, as parents and next friends of Jackie Doe, sued the Texas Department of Protective and Regulatory Services ("TDPRS") and social worker Beverly Strickland after Strickland visually searched

Jackie's body cavities without a court order. The district court dismissed the claims against the TDPRS, and plaintiffs do not appeal that dismissal. The court, however, rejected Strickland's motion for summary judgment, and Strickland appeals based on the denial of qualified immunity.

Although we conclude that the plaintiffs pleaded a claim and raised a fact question as to whether Strickland violated Jackie's Fourth Amendment rights, we reverse because those rights were not clearly established at the time of the search. Strickland is entitled to qualified immunity. The other allegations do not establish violations of the Fourth and Fourteenth Amendments. We remand for consideration of a state law claim.

## I.

Strickland worked for TDRPS in the Children's Protective Services ("CPS") division. On June 29, 1999, the CPS Statewide Intake Unit received a "hotline" call concerning Jackie, alleging that while she was attending a day camp, someone observed her "touch[ing] another six-year-old female's private parts and kiss[ing] her on the lips"; Jackie then allegedly "began dancing and licked her finger and ran it down her body and touched her own private parts." The events occurred in a bathroom where Jackie, naked, was changing out of her swimsuit.

The intake workers concluded that Jackie's "behavior indicates that she may have been sexually abused." The report assigned the case a priority 2 status, requiring a CPS investigator to attempt contact with the family in ten days. Samantha Woods, the supervisor for the CPS investigative unit, agreed with the priority 2 status and assigned the case to Strickland, who was required by law to make

a prompt and thorough investigation of the child abuse report. TEX. FAM. CODE ANN. § 261.301 (West Supp. 2002).

On July 6-8, Strickland unsuccessfully attempted to contact Mrs. Roe. On July 9, Mrs. Roe called Strickland, using a business card that Strickland had left on Mrs. Roe's doorstep. According to Mrs. Roe, during the July 9 phone conversation Strickland introduced herself, explained that she worked for CPS, and said she needed to talk to Mrs. Roe. Strickland declined to describe the purpose of the visit and insisted that they talk in person. Strickland stated only that she had received a "referral concerning the care and welfare" of Jackie. Strickland and Mrs. Roe made an appointment for Strickland to visit Mrs. Roe's house the next morning.

On July 10, Strickland arrived at the house. Mrs. Roe testified that she had a brief conversation with Strickland outside the front door; Strickland introduced herself again, explained her affiliation with CPS, and gave Mrs. Roe a business card. Mrs. Roe testified that Strickland entered the house without an invitation or permission; Strickland maintains that she was invited inside. Mrs. Roe testified that Strickland did not act in a manner designed to frighten or intimidate. Mrs. Roe also admitted that she did not say or do anything to show that she did not want Strickland to enter.

After entering the house, Strickland explained the purpose of the visit and discussed the report that had been made to CPS. Mrs. Roe asked Strickland whether she should contact an attorney, and Strickland stated, "Oh no, no. Don't worry about it. You don't need anybody."

After asking some questions, Strickland told Mrs. Roe that she needed to take pictures of Jackie. Strickland did not give the mother the option of submitting to the examination and pictures or refusing them. Strickland did not disclose the type of pictures or extent of the examination. Strickland acknowledges that she could have requested a medical examination but did not do so. She had received no training in photography of children's genitalia.

Strickland asked Mrs. Roe to remove the child's upper clothing, so she could look for bruises or marks. Strickland found none. Strickland then asked Mrs. Roe to remove Jackie's underwear, so that Strickland could see if anything was abnormal. Mrs. Roe asked whether it was really necessary, and Strickland responded "Oh, don't worry. It's more stressful for the parent than it is the child." Strickland took pictures of Jackie's vagina and buttocks in a closed position, and then instructed Mrs. Roe to spread Jackie's labia and buttocks, so that she could take pictures of the genital and anal areas. Although Mrs. Roe asked a couple of times whether the photographs were necessary, she never requested that Strickland stop. Mrs. Roe "teared up" as Strickland took the pictures, but did not cry.

Mrs. Roe testified that Strickland never said anything about removing the child from the home. After taking the pictures, Strickland interviewed Jackie for fifteen to twenty minutes. Strickland and Mrs. Roe had another brief discussion, and Strickland left.

Plaintiff's expert, Lawrence Daly, testified by affidavit that Strickland could not have believed in good faith that the examination and pictures were necessary. Woods testified that she would not have taken the pictures but opined that the decision to do so lay within Strickland's discretion. Robert Brown, a Program Director at CPS, described the visual examination and pictures as appropriate because "caseworkers are trained to find and document all available evidence during their investigations." After Mrs. Roe's attorney complained to CPS, Woods reassigned the case to Michelle Carter. CPS "ruled out" abuse and closed the case.

Jackie subsequently experienced frequent nightmares involving the incident, and exhibited anxiety responses, for which she underwent counseling. The symptoms persisted for about six months. Mrs. Roe experienced a loss of sleep, sadness, and depression for the same period of time.

II.

Plaintiffs sued Strickland, TDPRS, and certain TDPRS officials under 42 U.S.C. § 1983, alleging a violation of their Fourth Amendment right to freedom from unreasonable searches, Fourth and Fourteenth Amendment rights to privacy, and Fourteenth Amendment liberty interests. They also asserted state law claims of invasion of privacy, intentional infliction of emotional distress, false imprisonment, trespass, and negligent failure to train and supervise.

Defendants filed a motion to dismiss and a motion for a reply under FED. R. CIV. P. 7. After plaintiffs filed a rule 7 reply, the court dismissed all defendants but Strickland, who then moved for summary judgment, asserting qualified immunity to the § 1983 claims and official immunity to the state law claims. The court denied the motion, whereupon Strickland filed her interlocutory appeal.

3

### III.

Social workers may assert a qualified immunity defense when sued under § 1983.[1] The denial of summary judgment based on qualified immunity is appealable under the collateral order doctrine before final judgment. *Mitchell v. Forsyth*, 472 U.S. 511, 526-28 (1985). We can review the denial only to the extent it "turns on a question of law." *Id.* If disputed factual issues are material to qualified immunity, the denial is not appealable. *Feagley v. Waddill*, 868 F.2d 1437, 1439 (5th Cir. 1989) (dismissing appeal because factual arguments went to merits and not to qualified immunity defense).

This appeal turns on legal questions about the scope of Mrs. Roe's and Jackie's constitutional rights and Strickland's qualified immunity defense. The only disputed, material fact is whether Mrs. Roe invited Strickland into the house while the two stood on the front porch. Because we can resolve the legal issue while assuming the truthfulness of Mrs. Roe's testimony, this is not the type of "material fact" issue that divests the appellate court of jurisdiction. *Cantu v. Rocha*, 77 F.3d 795, 803 (5th Cir. 1996). The limit on appellate review applies only when "what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that a particular conduct occurred." *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996).

Our decision hinges on the resolution of legal, not factual, questions. "We examine the plaintiffs' factual allegations only to determine whether they would be sufficient, if proven, to make out a violation of clearly-established law." *Geter v. Fortenberry*, 882 F.2d 167, 169 (5th Cir. 1989). Our review of the legal questions is *de novo*. *Id.*

### IV.

The district court found that plaintiffs created a fact question about whether Strickland's entry into their home violated their Fourth Amendment rights. Strickland argues, first, that social workers need not satisfy the traditional Fourth Amendment requirements when conducting an investigative home visit, and, second, that Mrs. Roe consented to her entry. We avoid the first question by holding that Mrs. Roe consented to an investigative home visit.

### A.

In reviewing a claim of qualified immunity, we are bound to follow the two-step inquiry explained in *Siegert v. Gilley*, 500 U.S. 226, 232-34 (1991). *Branton v. City of Dallas*, 272 F.3d 730, 744 (5th Cir. 2001). We first must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 2002 U.S. LEXIS 4884, at *11-*12 (U.S. June 27, 2002) (No. 01-309) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Only if we decide that the defendant state actor engaged in such "constitutionally impermissible conduct," *id.* at *16, do we proceed to the next step, which is to determine whether defendant's actions "violate[d] 'clearly established statutory or constitutional rights of which a reasonable person would have known,'" *id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The first question is governed by our

---

[1] *Doe v. Louisiana*, 2 F.3d 1412, 1416 (5th Cir. 1993) ("Child care workers are entitled to qualified immunity in the performance of discretionary, nonprosecutorial functions.") (citations omitted); *Stem v. Ahearn*, 908 F.2d 1, 5 (5th Cir. 1990) (same); *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988) (same).

current understanding of constitutional rights, and the second by what was reasonably understood at the time of the challenged act, which here occurred in July 1999.

### B.

The district court held that to enter a parent's or child's home and conduct an investigatory home visit, social workers must show probable cause and obtain a warrant, receive consent, or act in response to exigent circumstances. Strickland argues, to the contrary, that the court should have applied the more general (and lenient) "special needs" balancing test.

We have held that the Fourth Amendment regulates social workers' civil investigations, but we have not fleshed out the relevant Fourth Amendment standards.[2] The procedural postures of those cases did not require us to choose between applying the traditional or the special needs doctrines.[3] Selecting the applicable test for a social worker's investigative home visit would be a question of first impression in this circuitSSan issue over which other courts of appeals have divided.[4] We need not resolve this conflict, however, because we conclude that Mrs. Roe consented to an investigatory home visit.

### C.

As we have stated, the district court decided that plaintiffs created a fact question concerning whether Mrs. Roe consented to the strip search, but the court did not carefully isolate the question of Strickland's entry into the house. On appeal, Strickland argues that Mrs. Roe consented to the investigative home visit, so she should not have an individual claim for violation of her Fourth Amendment rights but, instead, could only assert Jackie's Fourth Amendment claim stemming from the search.

At the first stage of the *Siegert* inquiry, we assume the accuracy of Mrs. Roe's version of the facts. *Branton*, 272 F.3d at 744. On July 9, Strickland called Mrs. Roe, identified herself as a CPS worker, and requested to speak with her regarding Jackie's welfare. Strickland was evasive about the reason, but Mrs. Roe established an appointment for the home visit anyway. At the time of the appointment, Strickland appeared at Mrs. Roe's doorstep and asked for permission to enter;

---

[2] *Wooley v. City of Baton Rouge*, 211 F.3d 913, 925 (5th Cir. 2000) ("[I]dentical fourth amendment standards apply in both the criminal and civil contexts."); *Franks v. Smith*, 717 F.2d 183, 186 (5th Cir. 1983) ("A section 1983 action can also lie against others, such as social workers, where actions by them were taken in their official capacity as state employees.").

[3] *Wooley*, 211 F.3d at 925 (explaining that although defendants conceded that they lacked a warrant or probable cause, the panel must remand for defendants to provide record evidence of the importance of the governmental interest); *Franks*, 717 F.2d at 186 (deciding only that plaintiff created federal question jurisdiction under § 1983 by alleging that police officer and social worker entered home without permission).

[4] *Compare Wildauer v. Frederick County*, 993 F.2d 369, 372 (4th Cir. 1993) (applying "special needs" doctrine to social worker's investigative home visit to check for physical abuse) *with Good v. Dauphin County Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1094-95 (3d Cir. 1989) (applying traditional Fourth Amendment test to investigative home visit by police officer and social worker), *and Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999) (rejecting argument that social worker does not usually need a court order to make an investigatory home visit against parent's will).

Mrs. Roe did not respond, and Strickland went into the house.

Silence or passivity cannot form the basis for consent to enter.[5] But, Strickland relied on far more than Mrs. Roe's mere silence. Over the phone, Strickland had identified herself as a CPS employee and explained the general purpose of her visit, and Mrs. Roe had agreed to an appointed time for the home interview.

After that conversation, Strickland justifiably believed she had the right to enter. To rebut that justifiable belief, Mrs. Roe cannot rely only on her silence or passivity. Requiring Mrs. Roe to rescind her initial invitation does not relax the consent standard or encourage social workers to enter homes without permission. Although they still must obtain the parent's verbal, affirmative consent before conducting an investigative home interview, they need not obtain that consent again when they appear at the parent's doorstep.

It follows that the district court erred in holding that Mrs. Roe had not consented to Strickland's entry; the court should have dismissed Mrs. Roe's Fourth Amendment claim. Because, under the first step of the *Siegert* methodology, Strickland did not violate Mrs. Roe's Fourth Amendment rights, we need not advance to the second step of the *Siegert* test to address whether those rights were "clearly established."

V.

We next evaluate Jackie's Fourth Amendment claim against Strickland for the visual body cavity search and pictures. Mary and John Doe assert this claim on Jackie's behalf. We answer the first prong of the *Siegert* test by concluding that Strickland did violate Jackie's Fourth Amendment rights, but, moving to the second part of that test, we determine that those rights were not clearly established on July 10, 1999, so Strickland is entitled to qualified immunity.[6]

---

[5] In *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000), we held that a suspect did not consent when he lied about whether he lived in a house and failed to object to the subsequent search. In *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996), the panel refused to find consent where the officer did not ask for permission and the suspect did not grant permission but stood by as the officer searched. Finally, in *United States v. Cooper*, 43 F.3d 140, 145 n.2 (5th Cir. 1995), we explained that "nonresistance may not be equated with consent." In *United States v. Varona-Algos,* 819 F.2d 81, 83 (5th Cir. 1987), we reached a contrary result, upholding the conclusion that the suspect "had impliedly consented to the search by standing by and equivocally acknowledging the bag was his and allowing the trooper to go ahead without any objection."

*Varona-Algos*, however, predates the Supreme Court's shift to an objective standard for determining whether a suspect has consented to a search. We have recognized that the change in Supreme Court doctrine abrogated *Varona-Algos*. *Jaras*, 86 F.3d at 391 n.6 (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990); *Florida v. Jimeno*, 500 U.S. 248 (1991)).

[6] The Supreme Court has made plain that we should consider whether the public official has violated a constitutional right before we consider whether that right was "clearly established." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"); *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998) ("[T]he better approach to resolving cases
(continued...)

## A.

The district court held that the Fourth Amendment requires social workers to show probable cause and obtain a court order, receive consent, or act in response to exigent circumstances to search visually, and to photograph, a child's body cavities. On appeal, Strickland argues that the court should have applied the "special needs" balancing test instead. She contends that the anonymous hotline call justified her search under the more lenient test.

We have not addressed which Fourth Amendment test should apply to a social worker's visual search of a child's body cavities, and the other courts of appeals are divided. The Seventh Circuit has held that a child protective services worker need only satisfy the lesser special needs test and not the more rigorous probable cause requirement.[7]

The Third, Ninth, and Tenth Circuits have rejected the Seventh Circuit's approach and apply instead the traditional Fourth Amendment standard to juvenile strip searches.[8] The Second Circuit has taken an intermediate position: Even if social workers need not satisfy the probable cause and warrant requirement in all cases, they must obtain prior judicial approval when doing so would not threaten the child's well-being.[9] To take sides in this inter-circuit conflict, we focus on Supreme Court precedent establishing the "special needs" doctrine.

In "special needs" cases, the Court has carved out an exception to the warrant and probable cause requirement. Public officials can justify warrantless searches with reference to a "special need" "divorced from the State's general interest in law enforcement." *Ferguson v. City of Charleston*, 532 U.S. 67,

---

[6](...continued) in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

[7] *Darryl H. v. Coler*, 801 F.2d 893, 901 (7th Cir. 1986) ("On this record, we believe that the district judge was correct in holding that the searches in question here could be conducted without meeting the strictures of probable cause or the warrant requirement."); *Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 676-77 (7th Cir. 1990) (stating that *Darryl H.* did not "clearly establish" child's right not to take off her underpants when school official searched for evidence of physical abuse). The Fourth Circuit applies the more lenient standard to social workers investigative home visits, suggesting that it might follow the Seventh Circuit. *Wildauer*, 993 F.2d at 372 (citing *Wyman v. James*, 400 U.S. 309, 318 (continued...)

[7](...continued) (1971)).

[8] The Third and Ninth Circuits have held that a social worker must satisfy the warrant and probable cause requirements to conduct a strip search of a child. *Good*, 891 F.2d at 1092 (evaluating search of home and strip search of child under the probable cause and warrant standard); *Calabretta*, 189 F.3d at 817-18 (applying warrant and probable cause requirement to coerced strip search of three-year-old child in her own home). The Tenth Circuit has held that a police officer must obtain a search warrant before entering a home and conducting a strip search of an infant. *Franz v. Lytle*, 997 F.2d 784, 791 (10th Cir. 1993).

[9] *Tennenbaum v. Williams*, 193 F.3d 581, 604-05 (2d Cir. 1999) (requiring judicial approval where social workers removed five-year-old from school without parents' knowledge and had physician perform gynecological exam).

79 (2001). Special needs justify, for example, a principal's search of a student's purse for drugs in school; a public employer's search of an employee's desk; a probation officer's warrantless search of a probationer's home; a Federal Railroad Administration regulation requiring employees to submit to blood and urine tests after major train accidents; drug testing of United States Customs Service employees applying for positions involving drug interdiction; schools' random drug testing of student athletes, and drug testing of all public school students participating in extracurricular activities.[10] In all these cases, the Court

judged the search's lawfulness not by "probable cause" or "reasonable suspicion" but by "the standard of reasonableness under all of the circumstances." *O'Connor*, 480 U.S. at 725-26.

We must narrow these diverse cases to those most analogous to Strickland's visual body cavity search. Strip searches implicate fundamental Fourth Amendment rights.[11] Al

---

[10] *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) ("[T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers for . . . order in the schools does not require strict adherence to the requirement that searches be based on probable cause . . . ."); *O'Connor v. Ortega*, 480 U.S. 709, 728 (1987) ("[P]ublic employer intrusions on the constitutionally protected privacy interests of government employees for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances."); *Griffin v. Wisconsin* 483 U.S. 868, 873-74 (1987) ("A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."); *Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602, 620 (1989) ("The . . . interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office school or prison . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements")
(continued...)

[10](...continued)
(citations and internal quotations omitted); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 666 (1989) (permitting drug testing by Customs' service because of critical safety concerns and results were not made available to law enforcement); *Veronia Sch. Dist. v. Acton*, 515 U.S. 646, 657-58 (1995) (upholding uniform policy of suspicionless searches of student athletes); *Bd. of Educ. v. Earls*, 2002 U.S. LEXIS 4882, at *15 (U.S. June 27, 2002) (No. 01-332) (holding that special needs "inhere in the public school context").

[11] *Bell v. Woolfish*, 441 U.S. 520, 594 (1979) (Stevens, J., dissenting) (describing body cavity searches as "clearly the greatest personal indignity"); *Moore v. Carwell,* 168 F.3d 234, 236-37 (5th Cir. 1999) (holding that strip search of female prisoner in front of male guards might violate Fourth Amendment right to privacy); *Watt v. City of Richardson Police Dep't*, 849 F.2d 195, 199 (5th Cir. 1988) (finding that strip search of arrestee based on twenty-year-old minor drug offense violated the Fourth Amendment); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (describing strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission"); Scott A. Gartner, Note, *Strip Searches of Students: What Johnny Really Learned at School and How Local School Boards Can Help Solve the Problem*, 70 S.
(continued...)

though none of the "special needs" cases involved strip searches or nudity, the Court has long held that citizens have an especially strong expectation of privacy in their homes.[12] We therefore begin by examining the Court's two cases applying the "special needs" doctrine to investigative home searches.

In *Wyman*, 400 U.S. at 318, the Court upheld a New York law conditioning continued Aid to Families with Dependent Children benefits on permitting a home visit. The Court applied a general reasonableness test rather than requiring a warrant and probable cause. *Id. Wyman*, however, does not govern the instant case. First, the application of the general reasonableness test was *dictum*: The Court held that the visitation was not a search because criminal law did not compel it; the aid recipient could decline the benefits and no search would take place. *Id.* at 317-18. Second, the visitation promoted the statutory goal of ensuring a decent living standard for dependent children, the recipients received advanced notice, and the social workers did not target recipients based on individualized suspicion. *Id.* at 318, 320-21, 323. *All* AFDC recipients had to endure visitation; the government did not single out individual recipients based on potential criminal liability.

In *Griffin*, 483 U.S. at 872, the Court upheld a Wisconsin statute permitting probation officers to search probationers' homes based on "reasonable grounds." The Court reasoned that the operation of the probation system presents "special needs beyond normal law enforcement." *Id.* at 874. The Court distinguished the maintenance and operation of a prison or punitive regime from "generalized law enforcement." *Id.* Probation sits at the most lenient point on a continuum of punishments, but the state retains valid interests in rehabilitating the criminal and protecting society. *Id.* at 874-75. A warrant requirement would divest the state of its control over the punished probationers, residing outside of the prison's walls at the state's discretion. *Id.* at 876. The special status of probationers and the state's independent interests justify lowering the probable cause and warrant requirements. *Id.* at 878.

*Griffin* addresses searches based on particularized suspicion, but it does so in the special context of probationers. Probationers waive many of their privacy rights and have a much lower subjective expectation of privacy in the home; a warrant requirement would interfere with the special needs raised by their

---

[11](...continued)
CAL. L. REV. 921, 930-31 (1997) (describing emotional impact of strip searches).

[12] "[P]hysical entry into the home is the chief evil against which the . . . Fourth Amendment is directed." *United States v. United States Dist. Ct.,* 407 U.S. 297, 313 (1972). "At the very core [of the Fourth Amendment and the personal rights it secures] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). *See also Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."); *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1970) ("It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'").

rehabilitation. *Ferguson*, 532 U.S. at 81 n.15 ("[W]e agree with petitioners that *Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large."). And the Court bracketed the question whether the routine use of probation searches to obtain criminal convictions would violate the Fourth Amendment.[13]

The home search cases underscore the strength of Jackie's privacy interest. As the Seventh Circuit aptly explained in a decision pre-dating its adoption of the special needs test, "[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principles of human decency." *Doe v. Renfrow*, 631 F.2d 91, 92-93 (7th Cir. 1980) (per curiam); *supra* note 11.

The Court only rarely has permitted "special needs" searches in the face of a person's strong subjective privacy interests. In *Wyman* and *Griffin*, the searched persons voluntarily surrendered a great deal of the privacy interest in their homes. The Court has *never* upheld a "special needs" search where the person's expectation of privacy was as strong as is Jackie's interest in bodily

privacy.[14] The potency of her privacy interest makes us reluctant to apply the "special needs" doctrine.

The home search cases and the importance of Jackie's privacy interest give us pause; the Texas social workers' dual purposes and entanglement with law enforcement resolve the question. None of the previous courts of appeals to address these issues had the benefit of *Ferguson*, 532 U.S. 67, the Court's recent decision examining dual-purpose searches and the special needs doctrine.

In *Ferguson*, 532 U.S. at 78-79, the Court held that the higher probable cause and warrant standard applies where a state hospital's drug testing of pregnant women systematically threatened them with criminal liability. The pregnant women who tested positive faced either automatic criminal indictment or forced diversion into a treatment program. *Id.* at 73. The Court rejected the argument that protecting the health of the mother and child is a "special need" sufficient to dispense with the warrant requirement. *Id.* at 81.

Claimed special needs should receive "close review." *Id.* Where the "special need" is not "divorced from the state's general interest in law enforcement," the Court will not recognize it. *Id.* at 79. The Court views entanglement with law enforcement suspiciously. *Id.* at 81 n.15, 82. Other societal objectives cannot justify a program that would systematically collect information for the police. *Id.* at 83-84.

Strickland ultimately fails to identify a "spe-

---

[13] *Griffin*, 483 U.S. at 876 n.3 (emphasizing consent to search and absence of added legal penalty for noncompliance); *Skinner*, 489 U.S. at 621 n.5 ("We leave for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the FRA's program.").

[14] The Court has permitted visual body cavity searches only in the prison setting. *See Bell*.

cial need" separate from the purposes of general law enforcement. Identifying the goal of protecting a child's welfare and removing him from an abusive home is easy; disentangling that goal from general law enforcement purposes is difficult. In *Ferguson*, the Court also faced a quite worthwhile goalSSpreventing the obvious and severe health problems cocaine addiction caused to pregnant mothers and unborn infants. The Court could not, however, apply the "special needs" test to such a program where law enforcement was so deeply involved.

Strickland appropriately points to the fact that Texas law compels social workers to investigate allegations of sexual abuse; she neglects, however, to mention that the Texas statute deeply involves law enforcement in the investigation. CPS has a duty to notify law enforcement of any child abuse reports it receives. TEX. FAM. CODE ANN. § 261.105(b) (West Supp. 2002). The district attorney may request automatic notification of some or all types of reported physical or sexual abuse. *Id.* § 261.1055 (West Supp. 2002). Violating these reporting duties can result in criminal liability. *Id.* § 261.109 (West 1996). Finally, investigations into allegations of physical or sexual abuse are performed jointly with law enforcement agencies. *Id.* § 261.301(f) (West Supp. 2002).

Texas law describes social workers' investigations as a tool both for gathering evidence for criminal convictions and for protecting the welfare of the child. *Ferguson* teaches that we must apply the traditional Fourth Amendment analysis where a child protective services search is so intimately intertwined with law enforcement.

Strickland argues that a visual body cavity search often can disprove sexual abuse allegations. Perhaps. But their necessity in some cases does not say anything about social workers' need to perform *warrantless* searches in non-exigent circumstances. The social worker can take many preliminary steps short of visual body cavity searches, such as interviewing the child and the parents. In non-exigent circumstances, the worker then has time to obtain a warrant either personally to conduct a visual body cavity search or to have a physician perform it.

Social workers retain the power to seize a child if "exigent circumstances" exist; if they "have reason to believe that life or limb is in immediate jeopardy," they need not obtain a court order. *Tenenbaum*, 193 F.3d at 604-05 (citation omitted). Here, CPS assigned the case a priority 2 status, requiring Strickland to take action in ten days and giving her plenty of time to take other steps and/or seek a court order. The Texas Family Code establishes a procedure for obtaining such a court order.[15]

---

[15] The Texas Family Code contemplates that family courts may issue orders for entry into the child's home or school:

> If admission to the home, school, or any place where the child may be cannot be obtained, then for good cause shown the court having family law jurisdiction shall order the parent, the person responsible for the care of the children, or the person in charge of any place where the child may be to allow for entrance for the interview, examination, and investigation.

TEX. FAM. CODE ANN. § 261.303 (West Supp. 2002).

(continued...)

We conclude, therefore, that a social worker must demonstrate probable cause and obtain a court order, obtain parental consent, or act under exigent circumstances to justify the visual body cavity search of a juvenile. Because Strickland admits that she did not have probable cause and a warrant or face exigent circumstances, she can establish the constitutionality of her search only by showing that Jackie, or Mrs. Roe acting on her behalf, consented.

### B.

The district court found that Mrs. Roe had created a fact question on the issue of consent. Strickland claims that Mrs. Roe consented by failing to stop the search, removing Jackie's clothing, and spreading her private parts for the photographs.

Although Mrs. Roe gave affirmative consent to the home interview by scheduling a home visit, she *never verbally consented* to the visual body cavity search. Our caselaw teaches that silence or a failure to resist, standing

---

[15](...continued)

Texas law also contemplates that a family court may issue an order compelling a medical or psychological evaluation:

> If a parent or person responsible for the child's care does not consent . . . to a medical, psychological, or psychiatric examination that is requested by the department or designated agency, the court having family jurisdiction shall, for good cause shown, order. . . the examination to be made at the times and places designated by the court.

TEX. FAM. CODE ANN. § 261.303 (West Supp. 2002).

---

alone, cannot count as consent.[16] Inferring meaning from Mrs. Roe's cooperation at each step is even more problematic, because Strickland did not even explain the purpose of her visit until entering the house.

Strickland did not explain that she would be photographing Jackie's spread labia and anus until she instructed Mary to do so. Strickland even actively ignored Mrs. Roe's protests. Mrs. Roe asked whether she should call a lawyer, questioned whether the invasive search was necessary, and "teared up" while Strickland took pictures. Strickland brushed off Mrs. Roe's questions and ignored these signals. In the face of these signals, Strickland at least had the obligation to give Mrs. Roe a meaningful opportunity to deny consent.

In a similar case in which the mother participated in the strip search, the Seventh Circuit explained its refusal to find consent:

> It is not permissible to hold, as a matter of law that the mother's assistance in the procedure amounted to her consent. Indeed, it is difficult to imagine a mother, faced with the strip searching of her two young children in a public building, doing anything other than staying and attempting, by her presence, to alleviate the understandable apprehension of her children.

*Darryl H.*, 801 F.2d at 907. We conclude that Mrs. Roe and Jackie created a fact question as to whether Strickland violated Jackie's Fourth Amendment rights. We now turn to the question whether those rights were "clearly established" in 1999.

---

[16] *Supra* note 5.

C.

1.

The district court decided that precedent from other circuits had "clearly established" a parent's right to refuse the body cavity search of his child absent probable cause; the court found that any reasonable social worker would have known that his actions raised serious Fourth Amendment concerns. Strickland argues, to the contrary, that neither Supreme Court nor Fifth Circuit precedent "clearly established" such a right.

In *Hope*, the Court recently elaborated on what is required for a particular right to be "clearly established" in the context of qualified immunity. Reiterating what it previously had said, the Court explained:

> For a constitutional right to be clearly established, its coutours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell [v. Forsyth*, 472 U.S. 511,] 535, n.12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

*Hope*, 2002 U.S. LEXIS 4884, at *17.

The Court elaborated that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at *20. Previous cases need not be "fundamentally similar." *Id.* "The salient question" for a court of appeals is "whether the state of the law [at the time of the state action] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.*

2.

On July 10, 1999, Supreme Court and Fifth Circuit precedent plainly established the following: (1) A strip or body cavity search raises serious Fourth Amendment concerns, *Watt,* 849 F.2d at 199; and (2) The Fourth Amendment governs the lawfulness of a social worker's entry into a dwelling to resolve a child custody dispute.[17] Mary and Jackie need not prove that "the very action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640. We had not, however, ever addressed whether the traditional test or the "special needs" doctrine applies to a social worker's visual searches of naked juveniles.

This court had provided a little more guidance than simply these general principles. In *Doe*, 2 F.3d at 1420, we held that under the *Fourteenth Amendment* a social worker could subject a son and daughter to proctoscopic and culdoscopic examinations to check for abuse. Citing with approval the Seventh Circuit's decisions in *Darryl H.* and *Landstrom*, we held that the social workers could not have known that their efforts to investigate abuse violated the family's Fourteenth Amendment right to privacy. *Id.* We did not address the Fourth Amendment question, *id.* at 1417, 1420, but to a reasonable lay observer, *Doe* would have cast doubt on a child's constitutional right to refuse a visual body cavity search.

---

[17] In *Franks*, 717 F.2d at 186, we applied the same Fourth Amendment, probable cause standard to regulate the conduct of both a police officer and a social worker.

Even more importantly, in 1999 the Supreme Court had not yet explained whether agencies performing a legitimate "special need" entangled with law enforcement need to satisfy the probable cause standard. Subsequently, in *Ferguson*, 532 U.S. at 77-78, the Court distinguished previous drug testing cases that employed a general reasonableness balancing by emphasizing the hospital's "authority . . . to turn the results over to law enforcement agents without the knowledge or consent of the patients."

The Supreme Court's previously vague test for finding a "special need" caused the federal circuits to diverge over this precise substantive question[18] and to disagree again as to whether the rights were "clearly established" for purposes of qualified immunity.[19] It is difficult to argue that a matter of law is clearly established for state actors in this circuit where

---

[18] *Supra* notes 7-9.

[19] The Third and Ninth Circuits held that the children's rights were clearly established. *Good*, 891 F.2d at 1083-84 (finding that sparsity of child abuse cases does not justify officer or social worker's violation of bedrock constitutional principles about the privacy of the home and freedom from body cavity searches); *Calabretta*, 189 F.3d at 813 (interpreting circuit precedent that prohibited police officers from entering dwellings and resolving custody disputes without warrants). The Second and Seventh Circuits concluded that the Fourth Circuit's opinion in *Wildauer* justified refusing to grant qualified immunity. *Tenenbaum*, 193 F.3d at 605 (finding qualified immunity for removal of child from school and gynecological exam without warrant or court order); *Darryl H.*, 801 F.2d at 908 (granting qualified immunity in 1986 because neither the Supreme Court nor any court of appeals had addressed the constitutionality of child abuse searches).

this court has not opined on the issue in question and the other circuits are in disagreement as to whether the challenged acts constitute a constitutional violation.[20] We need not even reach the question whether, or to what extent, the law of other circuits may be relevant to our qualified immunity jurisprudence, in the absence of plain guidance from our own circuit's caselaw, because here the other circuits were inconsistent in their treatment of the rights here alleged.

Mrs. Roe and Jackie also argue, however, that even if the Fifth Circuit had not clearly rejected the "special needs" doctrine in 1999, Strickland's actions violate the general

---

[20] *Wilson*, 526 U.S. at 618 ("Between the time of the events of this case and today's decision, a split among the Federal Circuits in fact developed . . . . If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."); *Mitchell*, 472 U.S. at 534-35 & n.12 ("'[I]n cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law."); *Hall v. Thomas*, 190 F.3d 693, 696-97 (5th Cir. 1993) (finding law not clearly established, partially because "neither the Fifth Circuit nor the Supreme Court had spoken" and "a circuit split existed"); *Gunaca v. Texas*, 65 F.3d 467, 475 (5th Cir. 1995) (finding circuit split relevant as to whether right was clearly established); *McDuffie v. Estelle*, 935 F.2d 682 (5th Cir. 1991) ("Absent binding precedent in this circuit and faced with somewhat conflicting decisions in the two circuits which actually addressed the issue . . ., we cannot say that the law . . . was clearly established."). *But see Shipp v. McMahon*, 234 F.3d 907, 915 (5th Cir. 2000) ("[I]n determining whether a right is clearly established, we are confined to precedent from our circuit or the Supreme Court) (citation omitted).

reasonableness balancing test. By July 10, 1999, only the Seventh Circuit had applied the "special needs" doctrine to a social worker's warrantless, visual body cavity search. In the first such consolidated case, the Seventh Circuit affirmed the refusal to grant a preliminary injunction against the state agency's procedures; the court also affirmed a summary judgment in favor of the social workers because the child's constitutional rights were not clearly established. *Darryl H.*, 801 F.2d at 901. In the second case, the Seventh Circuit held that the doctrine's general balancing test did not clearly establish the child's constitutional rights. *Landstrom*, 892 F.2d at 676.

The *possibility* existed that other courts might have declared Strickland's strip search unconstitutional under the general balancing test.[21] A reasonable social worker in this circuit, however, knew only that *Doe* remained the law and that the Supreme Court had granted public officials broad leeway under the "special needs" doctrine.

Children's protective services workers face difficult decisions in the field. They must make on-the-spot decisions regarding whether to remove a child from a dangerous environment or whether, on the other hand, to make the judgment call that the child is in no danger and should remain with his family. Because the array of factual situations is endless, so too is the list of possible reactions to them. In July 1999, there was insufficient legal guidance, even under the standard enunciated in *Hope*, to inform a CPS worker that what Strickland did in reaction to the reports received about Jackie's conduct ultimately would be

considered a constitutional violation.

With *Doe* on the books and the "special needs" test governing, children's rights against these searches definitely were not "clearly established." Accordingly, on July 10, 1999, Jackie's rights, in the context of this case, were not clearly established, so Strickland is entitled to qualified immunity on the claim that she unconstitutionally conducted a visual body cavity search.

## VI.

The district court also refused to grant summary judgment on plaintiffs' claims that Strickland violated their Fourteenth Amendment rights to family association and bodily integrity. The Supreme Court, however, has repeatedly held that where the Fourth Amendment fully protects against a particular government intrusion, courts cannot consider substantive due process rights. The Fourth Amendment fully embraces a parent or child's claim that a social worker has unlawfully entered the home and conducted a visual body cavity search. Plaintiffs therefore cannot state a claim under the Supreme Court's substantive due process doctrine.

The Supreme Court has "always been reluctant to expand the concept of substantive due process." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). The more-specific-provision rule established in *Graham v. Connor*, 490 U.S. 386, 395 (1989), reflects this reluctance.

In *Graham*, the Court held that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive government conduct, that Amendment, not the more generalized notion of 'substantive due

---

[21] The Second Circuit did so on October 13, 1999. *Tenenbaum*, 193 F.3d at 605-06.

15

process,' must be the guide for analyzing the claims." *Id.* The Court rejected the petitioner's claimed right to be free from arbitrary exercises of government power that "shock the conscience." The Court did not cast doubt on the pedigree of that particular substantive due process right, but, instead, held that whenever the Fourth Amendment fully protects against an unlawful arrest, courts should not consider the vaguer protections established by substantive due process. Since *Graham*, the Court has adhered to this principle in a variety of contexts.[22]

The Fourth Amendment offered Mrs. Roe and Jackie complete protection from Strickland's investigative home visit and visual body cavity search. Mrs. Roe could have refused to permit Strickland's entry into the home, and Strickland then would have been forced to obtain a court order. Mrs. Roe refused to consent to the strip search, and the Fourth Amendment rendered that subsequent search unlawful; that amendment fully embraces the governmental action complained. We therefore cannot consider plaintiffs' substantive due process rights to family association and bodily integrity.[23]

This analysis is consistent with other child custody cases analyzing parents and children's rights to family association and bodily integrity. In every one of the family association cases, we conducted the substantive due process analysis because the social worker had removed the child from its family home.[24]

---

[22] *Lewis*, 523 U.S. at 842-44 (analyzing speeding motorcyclist's suit for officers' allegedly reckless pursuit under substantive due process because no "seizure" had occurred, and pursuit fell outside of Fourth Amendment's scope); *United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997) (finding that state judge's rapes of courthouse employees and job applicants could support independent claim under substantive due process); *id.* ("*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Whitley v. Albers*, 475 U.S. 312, 327 (1986) ("We think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified."). In *Albright v. Oliver*, 510 U.S. 266 (1994) (plurality), the Justices disagreed as to whether the Fourth Amendment's prohibition against unlawful arrests extended to a malicious prosecution claim. Every writing Justice, however, agreed that if the Fourth Amendment embraced the claim entirely, the Court could not consider a separate substantive due process claim.
(continued...)

[22](...continued)
*Id.* at 813 (Rehnquist, J., joined by O'Connor, Scalia, and Ginsburg, JJ.); *id.* at 814 (Scalia, J., concurring); *id.* (Ginsburg, J., concurring); *id.* at 817 (Kennedy, J., joined by Thomas, J., concurring); *id.* at 820-21 & n.2 (Souter, J., concurring); *id.* at 305-06, 310 (Stevens, J., joined by Blackmun, J., dissenting).

[23] The Second and Seventh Circuits have taken the same approach. *Tenenbaum*, 193 F.3d at 600 (refusing to analyze searches under substantive due process). *Cf. Darryl H.*, 801 F.2d at 901 n.7 (explaining that the court would use the same analysis to evaluate Fourth and Fourteenth Amendment claims).

[24] *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999) (deciding that teacher violated right to family integrity by falsifying sexual abuse charge
(continued...)

16

In the bodily integrity cases, we often have considered criminal assaults committed by teachers and other persons to whom the Fourth Amendment does not readily or easily apply.[25] Where the plaintiff alleges only harms stemming from a social worker's search, the Fourth Amendment provides the sole means for analysis.

## VII.

The district court denied Strickland's request for official immunity from the state law claims. Mrs. Roe and Jackie argue that we lack appellate jurisdiction over the district court's denial of Strickland's official immunity defense against the Texas state law claims.

A defendant may appeal an order denying immunity under state law if "the state's doctrine of qualified immunity, like the federal doctrine, provides a true immunity from suit and not a simple defense to liability." *Sorey v. Kellett*, 849 F.2d 960, 962 (5th Cir. 1988). Texas's official immunity doctrine relieves state officials of the burden of suit as well as of liability for damages. *Cantu*, 77 F.3d at 804. Consequently, we have jurisdiction to consider the question of state, official immunity.

Roe then argues that we lack jurisdiction because the district court's denial of official immunity turned on resolving a disputed issue of factSSwhether Strickland acted in good faith. The term "good faith" in Texas's official immunity cases is somewhat misleading. The Texas Supreme Court defines the test as objective and "derived substantially from the test that has emerged under federal immunity law for claims of qualified immunity in § 1983 cases." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994).[26] Because the

[24](...continued)
against father that led to three-year separation); *Kiser v. Garrett*, 67 F.3d 1166, 1173 (5th Cir. 1995) (describing right as "nebulous, especially in the context of a state's taking temporary custody of a child during an investigation of possible paternal abuse"); *Doe*, 2 F.3d at 1418 (considering case where social worker had fabricated charges of child abuse, which led to temporary separation of two children from their parents); *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988) ("[W]e do not think that appellants in this case should have known that their conduct in removing the Hodrowski children from the home violated the nebulous right of family integrity."). *See Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) (finding Fourteenth Amendment created substantive due process rights protecting against removal).

[25] *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994) (en banc) (finding substantive due process bars teacher from molesting student); *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995) ("[W]e have little trouble concluding that the Does' allegations are sufficient to establish that Sarah suffered an actionable deprivation of her liberty interest in freedom from sexual abuse by persons wielding state authority."); *Fee v. Hardin*, 900 F.2d 804, 808 (5th Cir. 1984) (citation and quotations omitted) (finding that a teacher violated a student's substantive due process rights by inflicting corporal punishment that was "arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning"); *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303, 305 (5th Cir. 1987) (finding teacher violated substantive due process by lashing second (continued...)

[25](...continued)
grade student to a chair for most of two school days).

[26] The Texas Supreme Court described the standard in more detail as applied to the pursuit (continued...)

district court denied the state official immunity defense for the same reasons it denied the federal defense, we have jurisdiction.

Although the Texas Supreme Court describes official immunity as similar to federal immunities, we have difficulty evaluating the claim of official immunity now that the constitutional claims have been dismissed. Dismissing those claims may not, however, guarantee Strickland official immunity for the state law claims of invasion of privacy, intentional infliction of emotional distress, false imprisonment, trespass, and negligent failure to train and supervise. We remand to the district court either to reconsider the official immunity question or to decline supplemental jurisdiction under 28 U.S.C. § 1367. If the court declines supplemental jurisdiction, it should dismiss without prejudice so that plaintiffs can pursue their claims in Texas state court.

The order denying qualified immunity is REVERSED. This matter is REMANDED for consideration of the state law claims and for further proceedings, as appropriate, in accordance with this opinion.

---

[26](...continued)
case before them:

> We hold that an officer acts in good faith in a pursuit case if:
>
>> a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit.

*City of Lancaster*, 883 S.W.2d at 656. *See Univ. of Houston v. Clark*, 38 S.W.3d 578, 586-87 (Tex. 2000) (resolving officer's official immunity defense at summary judgment); *Wadewitz v. Montgomery*, 951 S.W.2d 404, 466 (Tex. 1997) ("[A] court must measure good faith in official immunity cases against a standard of objective legal reasonableness."); 42 TEX. JUR. 3D *Government Tort Liability* § 123 (1995 ed.) ("The test is one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith and clarifies the good faith standard in official immunity cases generally.").

18