REVISED January 6, 2010

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2009

Charles R. Fulbruge III
Clerk

No. 09-40132

EDWARD WERNECKE, Individually; MICHELLE WERNECKE, Individually; KW, a minor, by and through her parents and legal guardians Edward Wernecke and Michelle Wernecke; JW, a minor, by and through his parents and legal guardians, Edward Wernecke and Michelle Wernecke; JW, a minor, by and through his parents and legal guardians, Edward Wernecke and Michelle Wernecke; JW, a minor, by and through his parents and legal guardians, Edward Wernecke and Michelle Wernecke

Plaintiffs - Appellees,

v.

LINDA KIM GARCIA, in her individual capacity; CLAIRA TRAINER, in her individual capacity

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas, Corpus Christi

Before KING, DAVIS, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

Edward and Michelle Wernecke and their four minor children (KW, JW, JW, and JW) brought suit under 42 U.S.C. § 1983 against Linda Kim Garcia and Claira Trainer for alleged violations of the Fourth and Fourteenth Amendments. The Werneckes allege that Garcia and Trainer illegally searched their residence

without a warrant and seized three of the children without a custody order. Garcia and Trainer bring an interlocutory appeal of the district court's order denying their motion for summary judgment on the ground of qualified immunity. We REVERSE in part, AFFIRM in part, and REMAND to the district court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Edward and Michelle Wernecke are the parents of three sons—JW (age 14), JW (age 5), and JW (age 2)—and one daughter, KW (age 12).[1] KW was diagnosed with Hodgkin's disease in January 2005, and she received chemotherapy treatments during the spring of 2005 at the Driscoll Children's Hospital in Corpus Christi, Texas. KW responded well to the chemotherapy treatments, but around May 2005, her physicians recommended that KW also receive radiation treatment to prevent reoccurrence of the disease; her parents refused to consent to radiation treatment. The physicians suspected medical neglect and referred KW's case to the Texas Department of Protective and Regulatory Services—now known as the Texas Department of Family and Protective Services (TDFPS).

Linda Kim Garcia, an investigative specialist for TDFPS, contacted Mrs. Wernecke by phone several times during May of 2005, encouraging her to make an appointment for KW to begin radiation treatment. One of KW's treating physicians had informed Garcia that KW needed to begin radiation treatment within ten days of May 27, 2005, in order to prevent reoccurrence of the cancer. Based on this information, Garcia told Mrs. Wernecke that the Werneckes needed to schedule an appointment by May 31 for KW to begin radiation treatment by June 6. On June 1, Garcia determined that the Werneckes had failed to schedule an appointment, and she executed an affidavit in support of

---

[1] The children's ages are as of June 2005.

2

a petition to take emergency temporary custody of KW. The petition and affidavit were presented that same day to a Nueces County judge, who granted the petition and signed an order giving TDFPS temporary custody of KW under Texas Family Code § 262.102. This order was based on the court's findings that (1) an immediate danger was posed to KW's physical health and safety; (2) there was no time for a full adversary hearing; and (3) TDFPS workers had made reasonable efforts to prevent or eliminate the need for removing KW.[2] Garcia neither sought nor received a warrant entitling her to enter or search the Wernecke home.

Around 5:30 p.m. on June 1, Garcia proceeded to the Wernecke home, accompanied by another TDFPS worker, Ben Campbell, and two Nueces County Deputy Constables.[3] Garcia presented the temporary custody order to Mr. Wernecke and asked to see KW; Mr. Wernecke told Garcia that KW was not at home and refused to disclose her location. An extended discussion between Mr. Wernecke and Garcia ensued, and at some point Mr. Wernecke gave his consent for the constables to enter the home to verify that KW was not there. Once the constables entered, they invited Garcia and Campbell in; Mr. Wernecke maintains that Garcia and Campbell entered the house without his permission.

Once inside the home, Garcia and Campbell inspected each room and each closet to verify if KW was present, but they did not find her.[4] While looking for KW, Garcia observed what she described as "deplorable" conditions, including piles of paper, food, trash, and clothes all over the house, and medications and

---

[2] The validity of the order is not at issue on this appeal.

[3] Apparently, it is "standard practice" in Texas for police officers to accompany TDFPS workers on home visits and to execute court orders. See Bennett v. Thomason, No. Civ.A.3:99-CV-0672-L, 2002 WL 655526, at *2 (N.D. Tex. April 18, 2002).

[4] Some time later, Garcia was able to contact Mrs. Wernecke, who informed her that KW and the youngest Wernecke son were with her, approximately four hours away from the Wernecke home.

syringes sitting out on the kitchen counter and dining room table. The Werneckes dispute this description of the condition of the house and specifically contest Garcia's statement that medication and syringes were within reach of the children; the Werneckes contend that the medications were actually vitamins for KW, stored in plastic containers with child locks, and that the syringes were in their original packaging, with a hard plastic covering around each syringe. According to the Werneckes, the children were not allowed near the medications or syringes without adult supervision.[5]

Garcia, concerned about the safety of the two boys in the Wernecke home, asked Mr. Wernecke to sign a safety plan requiring him to clean the house; he refused. Garcia contacted Claira Trainer, the on-call supervisor for TDFPS, who asked that Garcia attempt to institute a voluntary placement with family members. When that placement fell through, Garcia again contacted Trainer, who discussed the situation with the TDFPS program director, Lourdes Ramirez, who made the determination that the boys needed to be placed in foster care. The following day—June 2, 2005—Garcia obtained an order from a Nueces County judge granting TDFPS temporary custody of all three boys.

The Werneckes filed suit against TDFPS, Nueces County, the two constables, and six TDFPS workers—including Garcia and Trainer—in federal district court under 42 U.S.C. § 1983, alleging violations of their Fourth and Fourteenth Amendment rights.[6] Garcia and Trainer moved for summary

---

[5] As discussed in greater detail below, the district court recognized that the Werneckes raised a genuine issue of material fact as to whether it was objectively reasonable to conclude that the sum total of the conditions observed amounted to exigent circumstances sufficient to justify taking custody of the children. In undertaking our review, we assume the Werneckes' version of the facts to be true and then decide if that version of the facts suffices for a claim of illegal seizure under these circumstances. See Wagner v. Bay City, Tex., 227 F.3d 316, 320 (5th Cir. 2000).

[6] Other defendants—TDFPS, Nueces County, the two constables, and four other TDFPS workers—were dismissed from the case on various grounds, none of which is at issue in this appeal.

judgment based on qualified immunity, but the district court denied the motion. As to the entry and search of the Wernecke home, the district court found that the Werneckes had raised a genuine issue of material fact as to whether Garcia's entry was objectively reasonable, precluding qualified immunity. The district court did not specifically discuss Trainer's involvement with the entry. Regarding the seizure of the boys, the district court found that a genuine issue of fact existed as to whether exigent circumstances justified the seizure and as to whether Trainer acted with deliberate indifference in approving the removal of the boys. The district court did not separately address the Werneckes' Fourteenth Amendment due process claims in its order.[7] Garcia and Trainer take this interlocutory appeal from the district court's denial of their motion for summary judgment.

## II. JURISDICTION AND STANDARD OF REVIEW

While ordinarily courts of appeals may not review interlocutory decisions of lower courts, "the Supreme Court has held that the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review." Kinney v. Weaver, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (citing Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)). "Our jurisdiction is significantly limited, however, for it extends to such appeals only 'to the extent that [the denial of summary judgment] turns on an issue of law.'" Id. (quoting Mitchell, 472 U.S. at 530).

---

[7] In previous cases, where individuals bring both Fourth and Fourteenth Amendment claims premised upon the same underlying facts—the removal of children—the Fifth Circuit and other circuits have held that the procedures required for a constitutional search and seizure under the Fourth Amendment are adequate to protect the parents' procedural due process rights and liberty interest in directing the upbringing of their children. See Gates v. Tex. Dep't of Protective & Regulatory Servs., 537 F.3d 404, 434–35 (5th Cir. 2008) (citing cases). The Werneckes' Fourteenth Amendment family integrity claims center on the seizure of JW and JW. Because the same facts underlie both the Fourth and Fourteenth Amendment claims, see id., and because this case must be remanded for further factual development, we will not conduct a separate analysis of the Werneckes' Fourteenth Amendment claims.

In denying a motion for summary judgment on qualified immunity grounds, the district court makes two determinations: first, whether "a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law," and second, whether "a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." Id. We have jurisdiction to review the first type of determination—"the purely legal question whether a given course of conduct would be objectively unreasonable in light of clearly established law"—but we may not review the second type of determination—"the district court's assessments regarding the sufficiency of the evidence." Id. at 346–47. Stated differently, "we have jurisdiction only to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts . . . . '[W]e can review the materiality of any factual disputes, but not their genuineness.'" Id. at 347 (quoting Wagner v. Bay City, Tex., 227 F.3d 316, 320 (5th Cir. 2000)) (emphasis in original; modification added).

While the Werneckes contend that genuine issues of material fact preclude jurisdiction in this case, our inquiry does not seek to determine disputed questions of fact. Rather, this appeal "concerns the purely legal question whether [Garcia and Trainer] are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record." Id. In ruling on this question, we must assume that the Werneckes' version of the facts is true. Wagner, 227 F.3d at 320 ("Even where, as here, the district court has determined that there are genuine disputes raised by the evidence, we assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of [illegal search and seizure] under these circumstances."). While ordinarily our standard of review on a denial of summary judgment would be de novo, applying the same standard as the district court, the standard changes because we lack jurisdiction, in the qualified

6

immunity context, to review the decision that a factual dispute exists. Kinney, 367 F.3d at 348. Instead, we consider "whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." Id.

## III. DISCUSSION

The doctrine of qualified immunity offers a shield against civil liability for government employees "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, — U.S. —, —, 129 S. Ct. 808, 815 (2009). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at 818–19) (citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court articulated a mandatory "two-step sequence for resolving government officials' qualified immunity claims." Pearson, 129 S. Ct. at 815. Saucier required that lower courts consider first, whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law," Kinney, 367 F.3d at 350, and second, if a violation has been alleged, "whether the right was clearly established" at the time of the alleged government misconduct, Saucier, 533 U.S. at 201. In the recent case of Pearson v. Callahan, the Court reconsidered the Saucier procedure, determined that "while the [two-step] sequence . . . is often appropriate, it should no longer be

regarded as mandatory," and gave lower courts "permi[ssion] to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 129 S. Ct. at 818. In conducting our initial inquiry—whether the Werneckes have alleged a violation of a constitutional right—we "employ currently applicable constitutional standards." Kinney, 367 F.3d at 350.

On the second inquiry—whether the right allegedly violated is "clearly established"—"'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Kinney, 367 F.3d at 349–350 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" Id. at 350 (quoting Anderson, 483 U.S. at 640). "[W]hat 'clearly established' means . . . depends largely 'upon the level of generality at which the relevant "legal rule" is to be identified.'" Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Anderson, 483 U.S. at 639). "[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract." Kinney, 367 F.3d at 350. Officials should receive the protection of qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" Id. (quoting Saucier, 533 U.S. at 206). The court's focus, for purposes of the "clearly established" analysis, should be on "fair warning": qualified immunity is unavailable "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." Hope v. Pelzer, 536 U.S. 730, 740 (2002).

A. Entry of Wernecke Home and Search for KW

Garcia contends that the district court erred in denying her qualified immunity for her entry into the Wernecke home and her search for KW. Under the Supreme Court's qualified immunity jurisprudence, we first ask if the Werneckes have asserted a violation of a constitutional right. The Fourth Amendment protects against unreasonable searches and seizures, and "it is well established in this circuit that the Fourth Amendment regulates social workers' civil investigations." Gates v. Tex. Dep't of Protective & Regulatory Servs., 537 F.3d 404, 420 (5th Cir. 2008). "In assessing the reasonableness of a search . . . , we must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Wooley v. City of Baton Rouge, 211 F.3d 913, 925 (5th Cir. 2000) (quoting United States v. Place, 462 U.S. 696, 703 (1983)). "Warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." Gates, 537 F.3d at 420 (quoting United States v. Gomez–Moreno, 479 F.3d 350, 354 (5th Cir. 2007)) (modification omitted).

Garcia indisputably engaged in a search when she entered the Werneckes' home to look for KW. The Werneckes assert that this entry and the ensuing search were neither permitted by a search warrant (or its equivalent) nor reasonable. Garcia argues that the Nueces County court order giving TDFPS temporary emergency custody of KW under Texas Family Code § 262.102 gave her the implied authority to enter the home and search for KW; alternatively, she argues that the entry and search were reasonable under the circumstances. The district court found that the Werneckes' allegations of an illegal search satisfied the first Saucier inquiry and continued on to consider whether the right allegedly violated was clearly established. The district court's finding that the Werneckes alleged a Fourth Amendment violation was predicated on the district court's understanding that "Garcia did not possess a warrant or an equivalent

court order authorizing her to enter the Wernecke residence on June 1, 2005," and that under Texas Family Code § 261.303(b), "[f]amily courts in Texas may issue orders authorizing caseworkers to enter a private home to investigate child abuse or child neglect." To evaluate whether this understanding is correct, we turn to the Texas Family Code and the procedures for seeking emergency custody orders.

Under the Texas Family Code, TDPFS may seek a temporary court order giving custody of a child to TDFPS on an emergency basis. See TEX. FAM. CODE ANN. § 262.102(a) (Vernon 2009). This order may be obtained ex parte and without notice to the parents of the child; however, the court must first make three findings:

> (1) there is an immediate danger to the physical health or safety of the child . . . and . . . continuation in the home would be contrary to the child's welfare;
>
> (2) there is no time, consistent with the physical health or safety of the child and the nature of the emergency, for a full adversary hearing . . . ; and
>
> (3) reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to prevent or eliminate the need for removal of the child.

Id. (footnote call omitted). The court order that Garcia obtained was issued under this section of the Texas Family Code,[8] and the order specifically stated that TDFPS "is named temporary sole managing conservator of [KW], with all

---

[8] The question whether the Nueces County court reached the correct result in issuing this order is not before us. The district court concluded that:

> the custody battle over [KW] in 2005 is outside the scope of the [federal] case. Any claims that the [Werneckes] might wish to assert regarding the actions of [TDFPS] in assuming custody of [KW] in June 2005 are barred by either or both of the parallel doctrines of claim preclusion (res judicata) and issue preclusion (collateral estoppel). . . . [T]he [Werneckes] had a full and fair opportunity to litigate the issue of [KW]'s custody [in state court]. It goes without saying that this [federal district c]ourt does not and cannot sit as an appellate court over the County Court at Law of Nueces County or any other Texas court.

The Werneckes do not question that conclusion, nor could they.

of the rights and duties listed in § 153.371, Texas Family Code, until a full adversary hearing is held." Section 153.371, entitled "Rights and Duties of Nonparent Appointed as Sole Managing Conservator," gives the appointed managing conservator "the right to have physical possession . . . of the child [and] the duty of care, control, protection, and reasonable discipline of the child." TEX. FAM. CODE ANN. § 153.371(1), (2). Section 261.303(b), on which the district court relied, is entitled "Interference With Investigation; Court Order," and states that "[i]f admission to the home, school, or any place where the child may be cannot be obtained, then for good cause shown the court . . . shall order the parent . . . to allow entrance for the interview, examination, and investigation." TEX. FAM. CODE ANN. § 261.303(b).

The Supreme Court has been clear in its interpretation of the Fourth Amendment that "[a]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980); see also United States v. Barrera, 464 F.3d 496, 501, 504 (5th Cir. 2006) (applying Payton).[9] Garcia argues that this reasoning should extend to child custody orders as well.

In our most recent opinion on the interplay between child abuse and neglect investigations and the Constitution, we held that "the government may not seize a child from his or her parents absent a court order,[] parental consent, or exigent circumstances." Gates, 537 F.3d at 429 (footnote call omitted). We noted that in the context of a seizure, "[a]n order properly issued by a court

---

[9] In Steagald v. United States, the Court considered "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." 451 U.S. 204, 212 (1981). There, the Court declined to extend the Payton search warrant exception to the homes of third parties not named in an arrest warrant. See id. at 220. For purposes of our inquiry, Payton, rather than Steagald, controls, as KW resided with her parents in the Wernecke home.

pursuant to Texas Family Code § 262.102, which authorizes state courts to issue emergency orders to take possession of a child, . . . suffice[s] to meet the 'warrant' requirement . . . ." Id. at 429 n.16. At least one other circuit has made the same observation. See Burgess v. Houseman, 268 F. App'x 780, 783 & n.1 (10th Cir. 2008) (quoting J.B. v. Washington County, 127 F.3d 919, 930 (10th Cir. 1997), for the proposition that "[i]n the context of a seizure for child protection, a juvenile court order often serves the function of a warrant"). If a court order under § 262.102 suffices to meet the Fourth Amendment warrant requirement for a seizure, we see no reason that it should not also meet the warrant requirement in the context of a search of a child's home to locate the child. Applying the rule from Payton v. New York, if the social workers executing a court order have reason to believe that the child is located within his or her home, the order itself will suffice to satisfy the warrant requirement. We note in particular that Texas law imposes on TDFPS workers the "duty of care, control [and] protection" of the child named in the § 262.102 order. TEX. FAM. CODE ANN. § 153.371(2).[10] Under the Fourth Amendment, we find it reasonable and permissible for state workers in possession of a facially valid temporary

---

[10] Furthermore, Texas also requires that a full adversary hearing be held within fourteen days of the removal of a child under a § 262.102 order. Id. § 262.201(a) ("Unless the child has already been returned to the parent . . . a full adversary hearing shall be held not later than the 14th day after the date the child was taken into possession by the governmental entity."). At this adversary hearing, the court

> shall order the return of the child to the parent . . . unless the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child; (2) the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal; and (3) reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home.

Id. § 262.201(b). In this case, a full adversary hearing was held on June 15–16, 2005, ten days after the initial attempt to take custody of KW. The Nueces County court decided not to return KW to her parents at that time.

custody order, with a duty under state law to take care of the child, to enter the child's home to look for the child.

In this case, Garcia investigated the report of medical neglect from KW's physicians in accordance with her state law duties.[11] She encouraged the Werneckes to schedule an appointment for KW to begin radiation treatment; when they did not do so, she presented the results of her investigation to a neutral and detached judge, who issued an order giving TDFPS temporary custody of KW. When she arrived at the Wernecke home on the afternoon of June 1, she had reason to believe that KW would be inside; in the absence of other information, it was reasonable to believe that a twelve-year-old child—particularly one who had recently undergone extensive chemotherapy treatment for a life-threatening disease—would be at home on a weeknight. Garcia did not need to take Mr. Wernecke at his word that KW was not at home; in fact, a parent might well not be candid about the child's whereabouts in this situation. In those circumstances, Garcia did not violate the Fourth Amendment by entering the Wernecke home to look for KW.

The district court reached the conclusion that Garcia's entry was warrantless—and thus improper—based on § 261.303(b) of the Texas Family Code, which allows a court to issue an order allowing TDFPS workers to enter "any place where the child may be" in order to "interview, examin[e], and investigat[e]" the child upon a showing of good cause. However, this section—entitled "Interference with Investigation"—is purely an investigative tool and is not relevant to our constitutional analysis. Once Garcia obtained the § 262.102 order, she was not required to acquire an additional court order aimed only at the investigative process—just as a police officer who obtains a facially

---

[11] The Texas Family Code requires that TDFPS "make a prompt and thorough investigation of a report of child abuse or neglect allegedly committed by a person responsible for a child's care, custody, or welfare." TEX. FAM. CODE ANN. § 261.301(a).

valid arrest warrant is not required to secure an additional search warrant in order to arrest the suspect in his home.  Cf. Payton, 445 U.S. at 603.

We address three points raised by the Werneckes.  First, the Werneckes note that Garcia "admitted . . . that the state court order [did] not permit her to enter and search the Wernecke home."  However, the subjective understanding of a state official is not relevant to our constitutional inquiry.  Cf. Graham v. Connor, 490 U.S. 386, 397 (1989) (conducting constitutional analysis based on whether officers' actions were objectively reasonable, "without regard to [the officers'] underlying intent or motivation").  To the extent that the Werneckes suggest that TDFPS training and procedures prohibit social workers from entering private homes absent a search warrant, consent, or exigent circumstances, we decline to penalize TDFPS for exercising prudence in enacting procedures that offer greater protection than the constitutional minimum.

Second, the Werneckes contend that there was no emergency or exigent circumstances that would justify a warrantless entry into their home.  This argument is misdirected, given our discussion above.  However, in brief response, the Nueces County court had to find explicitly that the need for removal was urgent before issuing the § 262.102 order.  See TEX. FAM. CODE ANN. § 262.102(a)(1), (2) (requiring a finding of "immediate danger" to child and "no time" for full adversary hearing).  These findings supported an objectively reasonable belief that exigent circumstances existed justifying the entry and search for KW (the only child named in the § 262.102 order).

Third, the Werneckes also argue that Wooley v. City of Baton Rouge stands for the proposition that officers may not rely on a custody order to enter a private home.  This reliance is misplaced for two reasons.  First, Wooley involved a private custody dispute between the child's mother and grandparents—not a child abuse or neglect investigation by a state agency.  211 F.3d at 917.  Second, the Louisiana custody order the officers relied upon in entering the home and

seizing the child was not analogous to a § 262.102 order—it was merely a "[g]eneral order[] stating that one parent is to have custody of the child," not "a specific order signed by a judge and direct[ing] law enforcement to pick up a certain child and deliver him/her to a certain place." Id. at 926.

We conclude with a reflection upon the policy concerns underlying both our Fourth Amendment jurisprudence generally and our holding on this issue in particular. The Supreme Court has recognized the problem posed to law enforcement by inherently mobile subjects of an investigation, cf. Chambers v. Maroney, 399 U.S. 42, 51 (1970) (approving warrantless search of automobile based on probable cause in part because "the opportunity to search is fleeting since a car is readily movable"), and the Fifth Circuit has reiterated this concern in the child protection investigation context in Gates, where the panel included "the risk that the parent will flee with the child" on a list of factors informing the Fourth Amendment reasonableness analysis, 537 F.3d at 429. The facts of this case validate our continuing concern with the risk of flight in Fourth Amendment cases: KW was not present in the Wernecke home because Mrs. Wernecke had, in fact, absconded with her to prevent TDFPS from taking KW into protective custody. TDFPS did not take physical custody of KW until June 4, 2005, three days after the § 262.102 order was issued, because of Mrs. Wernecke's evasion. With these concerns firmly in mind, we reiterate that when a state social worker obtains from a judge a temporary emergency custody order that imposes legal duties on the state agency and has reason to believe the child is within the child's home, the social worker may, consistent with the Fourth Amendment, enter and search the home for the child.

### B. Seizure of Wernecke Boys

Garcia and Trainer also challenge the district court's denial of summary judgment as to the seizure of the Wernecke boys. We again begin our qualified immunity analysis by asking if the Werneckes have asserted a violation of a

constitutional right. "To determine the constitutionality of a seizure 'we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting Place, 462 U.S. at 703). In Gates, we laid out the standard for the Fifth Circuit to apply in reviewing seizures of children by government agency workers following abuse or neglect investigations: "[T]he government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." 537 F.3d at 429. Gates defined "exigent circumstances" to mean "that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home." Id.[12] We described the analysis as "a flexible inquiry that considers all of the facts and circumstances with no one factor being dispositive," and listed as non-exclusive factors:

> whether there was time to obtain a court order . . . [,] the nature of the abuse (its severity, duration, and frequency), the strength of the evidence supporting the allegations of abuse, the risk that the parent will flee with the child, the possibility of less extreme solutions to the problem, and any harm to the child that might result from the removal.

Id.

In Gates, social workers removed children from their home without a court order or warrant after investigating "allegations of recent physical abuse" by their father. Id. at 430. Gates considered the "information [that] was known by the [TDFPS] employees making the decision to remove" the children in determining whether exigent circumstances existed. Id. at 429. We specifically noted that one young child "displayed two small wounds that had allegedly been

---

[12] We also confined this standard to removals from the home and laid out a separate standard for removals from other locations, including schools. Gates, 537 F.3d at 432.

inflicted by" the father, and several siblings corroborated the story that the father had inflicted those wounds that morning. Id. In addition, the children had described "unusual discipline methods," including forcing children "to throw up food they had eaten" and handcuffing one child to a bed. Id. at 430. We found that "obtaining a court order in a timely fashion was likely not possible," as the investigation had continued past the close of the state courts for the day, and we also observed that TDFPS employees had "considered and ruled out . . . less drastic options" before deciding to remove the children. Id. While we deemed the case a "close call," we ultimately decided that, given the totality of the circumstances, the TDFPS employees did not violate the Fourth Amendment by seizing the Gates children without a court order. Id.

Adopting the Gates standard to fit a child endangerment investigation—rather than an abuse investigation—we consider most of the same factors, including the available time to obtain a court order, the risk that a parent might flee with the child, the availability of less extreme solutions, and any harm to the child that might arise from the removal. See id. In addition, we adapt several factors to fit the child endangerment context and consider the nature of the danger facing the child (its severity, duration, frequency, and imminence), the strength of the evidence supporting immediate removal, and the presence or absence of parental supervision. Cf. id.

In applying this standard to Garcia's removal of JW and JW from the Wernecke home, we must view the summary judgment evidence in the light most favorable to the Werneckes, as the non-moving parties. See Kinney, 367 F.3d at 350. Therefore, we summarize the summary judgment evidence regarding the condition of the home in the light most favorable to the Werneckes. When Garcia arrived, Mr. Wernecke was in the home with his fourteen-year-old son JW and his five-year-old son JW. Garcia observed medications and syringes, allegedly within reach of the two boys. However, the

Werneckes assert that Mr. Wernecke was in the process of dispensing KW's medications for the week when Garcia arrived, and some of the pills were out on the kitchen counter, but they were in plastic containers with child locks. Animal syringes were also on the kitchen counter, but they were encased in their original packaging—a hard plastic covering around each individual syringe—and located inside a paper bag. The Werneckes state that the plastic covering would be difficult for a child to break through, and that Mr. Wernecke was present to supervise both boys around the medications and the syringes. The Werneckes own firearms, but they were stored in a locked closet, away from the children.

According to Garcia, the Wernecke home was "unsanitary" and in "deplorable condition." Garcia described seeing piles of paper, food, trash, and clothes throughout the home. She claimed to see animal feces on the floor, but the Werneckes argue she mistook watermelon and sunflower seeds for feces. The Werneckes aver that their home was not in an unsanitary condition, but was merely cluttered. Taking these facts in the light most favorable to the Werneckes, we assume that the home was cluttered but not unsanitary.

The Werneckes do not dispute the following facts. The entry into the Wernecke home occurred in the evening, after the conclusion of business hours. Prior to removing the boys, Garcia first attempted to institute a safety plan that would allow the boys to stay at home if Mr. Wernecke cleaned up the home; when Mr. Wernecke refused to sign the safety plan, she attempted to place JW and JW with Mr. Wernecke's parents. Mr. Wernecke's parents initially agreed to let Garcia inspect their home to ensure it was safe for the boys, but then they refused to unlock several rooms within their home. Because Garcia was unable to complete her inspection, she consulted with Trainer, her supervisor (who in turn consulted with Ramirez, the program director) and received permission to place the boys in state custody rather than with their grandparents.

Taking these facts in the light most favorable to the Werneckes, we conclude that, under the totality of the circumstances, an exigency did not exist that justified the removal of JW and JW on the evening of June 1, 2005. Although several factors seem to weigh towards the reasonableness of the removal—(1) business hours were concluded and obtaining a court order would likely not be possible in a timely fashion, (2) the risk of flight was high, as Mrs. Wernecke had already absconded with KW, and (3) Garcia attempted to institute both a safety plan and a placement with extended family before placing the boys in state custody—the sum of the Werneckes' facts does not indicate the existence of truly exigent circumstances. The presence of medications and syringes in the home, in child-proof containers and under parental supervision, does not rise to the level of exigency. Nor does mere clutter in the home. In the light most favorable to the Werneckes, a reasonable person would not believe that an immediate danger would be posed by JW and JW remaining in the home. Therefore, the Werneckes have asserted a Fourth Amendment violation by Garcia.

Although the Werneckes have asserted a constitutional violation, the question whether the applicable law was clearly established remains. The Werneckes argue that the general contours of the Fourth Amendment sufficed to give "fair warning" to reasonable officials of the alleged unlawfulness of the seizure of the boys. Although "[i]t could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,'" we recall that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Wilson, 526 U.S. at 615. Therefore, we must consider the state of the clearly established law in 2005 and whether it gave TDFPS employees "fair warning that their alleged treatment of [the plaintiffs was] unconstitutional." Roe v. Tex. Dep't of Protective & Regulatory Servs., 299 F.3d 395, 409 (5th Cir. 2002).

As of June 1, 2005, Fifth Circuit precedent clearly established that the Fourth Amendment governs social workers' investigations of allegations of child abuse. See id. at 409 & n.17 (noting that "[t]he Fourth Amendment governs the lawfulness of a social worker's entry into a dwelling" and citing Franks v. Smith, 717 F.2d 183, 186 (5th Cir. 1983), as applying Fourth Amendment standards to both a police officer and a social worker). We indicated in Roe v. Texas Department of Protective & Regulatory Services that "[s]ocial workers retain the power to seize a child if 'exigent circumstances' exist; if they 'have reason to believe that life or limb is in immediate jeopardy,' they need not obtain a court order." 299 F.3d at 407 (quoting Tenenbaum v. Williams, 193 F.3d 581, 604 (2d Cir. 1999)). We also discussed in Wooley v. City of Baton Rouge, 211 F.3d at 925, that, absent a warrant or probable cause, state officials must have some "evidence of danger" prior to seizing a child.

Garcia argues that in June 2005 the law was not yet clearly established, and she points us to our 2008 Gates decision, which purports to "define the Fourth Amendment standards that apply" in the context of warrantless seizures of children by social workers. 537 F.3d at 427. In Gates, we stated:

> In Roe, we noted in dicta that social workers may seize a child when exigent circumstances exist, specifically if they have reason to believe that life or limb is in immediate jeopardy. 299 F.3d at 407. However, we have never described in more detail the circumstances that will permit the warrantless seizure of such a child.

Id. at 428. Garcia argues that this statement indicates a lack of clarity in our law, such that she should be entitled to qualified immunity. We disagree. The Gates decision articulated a standard for determining when some evidence of danger rises to the level of an emergency justifying immediate removal, but Gates was not the first case to require, at a minimum, some evidence of imminent danger prior to removal. The quoted language from Roe, combined with the reference to "evidence of danger" in Wooley, clearly established that, at

the very least, some evidence of imminent danger to a child was required to justify a warrantless seizure. See Roe, 299 F.3d at 407; Wooley, 211 F.3d at 925. Officials do not receive the protection of qualified immunity when "in the light of pre-existing law the unlawfulness [of the challenged act is] apparent," and in the light of Roe and Wooley, Garcia's actions (as alleged by the Werneckes) were clearly unlawful. Pelzer, 536 U.S. at 739.

While the "flexible," factor-based standard of Gates gives additional guidance to social workers, the essentials of what was required in June 2005 for a social worker to effect a warrantless seizure in the factual circumstances confronting Garcia, as described by the Werneckes, were clear. According to the Werneckes, their home was merely cluttered; and animal syringes and medications were contained in child-proof containers in reach of JW and JW, but Mr. Wernecke was present to supervise. As discussed above, this factual scenario did not constitute an imminent danger to the boys. Based on the Werneckes' version of the facts, Garcia had no indication that either JW or JW faced an immediate threat to life or limb. On a scale of reasonableness, some actions are clearly reasonable, some are clearly unreasonable, and some fall into a gray area. Gates clarifies the law in the gray area, but Gates was not required to give social workers fair notice that imminent danger must exist before a child may be removed without a warrant or court order. On the facts as stated by the Werneckes, Fifth Circuit law clearly established in June 2005 that the warrantless seizure of the Wernecke boys—in the absence of any imminent danger—was a constitutional violation. Therefore, Garcia is not entitled to qualified immunity on the Werneckes' claim that she unconstitutionally seized JW and JW.

Finally, we turn to the question of whether the district court properly found that qualified immunity was unavailable to Trainer, the TDFPS supervisor on the evening of the removal. The Werneckes assert that Trainer

violated their Fourth Amendment rights by approving, via telephone, Garcia's removal of JW and JW. Under § 1983, "a supervisory official may be held liable . . . only if (1) [s]he affirmatively participates in the acts that cause the constitutional deprivation, or (2) [s]he implements unconstitutional policies that causally result in the constitutional injury." Gates, 537 F.3d at 435. At this stage in the litigation, the Werneckes are not arguing that TDFPS's policies are facially unconstitutional; therefore, their argument rests upon Trainer's alleged affirmative participation in the seizure of JW and JW.

In order to establish supervisor liability for "constitutional violations committed by subordinate employees," plaintiffs must show that the supervisor "act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates." Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 254 (5th Cir. 2005). In this context, deliberate indifference "'describes a state of mind more blameworthy than negligence,'" the equivalent of reckless disregard for a substantial risk. Id. (quoting Farmer v. Brennan, 511 U.S. 825, 835–36 (1994)). "The test for deliberate indifference is subjective, rather than objective, in nature because 'an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" Id. at 255 (quoting Farmer, 511 U.S. at 838).

In its order denying qualified immunity, the district court found that the Werneckes raised "a genuine fact issue as to whether . . . Trainer . . . acted with deliberate indifference toward [the Werneckes'] Fourth Amendment rights." However, based upon the record as developed by the Werneckes, Trainer was neither the ultimate decision-maker, nor was she actively involved in the decision to remove the boys. The record only contains one item submitted by the Werneckes that sheds light on the extent of Trainer's knowledge and involvement: the transcript of Trainer's deposition testimony, submitted by the

Werneckes in their response to the motion for summary judgment. Notably, Mr. Wernecke's affidavit does not mention Trainer or describe her involvement with the removal.

In her deposition, Trainer recounts that Garcia informed her that the home posed a danger to the children, and that based upon the information from Garcia, she "believed that there was enough danger to the children in that home and [she] needed to call the program director, which was [her] obligation." Trainer states that she called Ramirez twice, "once to let her know [Garcia was] working on a safety plan with relatives, and then the other time to say that the relative placement fell through." Trainer further states that Ramirez approved the removal; that she communicated Ramirez's decision to Garcia; and that Garcia removed JW and JW following the communication passed along by Trainer. While Trainer states that she participated in the communication between Garcia and Ramirez, and that she agreed with Ramirez's decision to remove, she clearly recounts that "ultimately, though, [she] did not have the authority to remove."

Based on Trainer's deposition—the only piece of evidence in the record put forth by the Werneckes that contains any information about her knowledge and involvement—Trainer was merely a conduit for information between Garcia, the case worker in the field, and Ramirez, the program director. Trainer believed that she had no independent authority to approve the removal of the Wernecke boys, and she did not, in fact, do so. Even taken in the light most favorable to the Werneckes, there is simply no basis for Trainer's liability on these facts, as a matter of law. The Werneckes have not pointed to any evidence to support a finding that Trainer acted with deliberate indifference towards their constitutional rights. Therefore, the Werneckes have not alleged a constitutional violation by Trainer, and she is entitled to qualified immunity.

## IV. CONCLUSION

For these reasons, we REVERSE the order denying Garcia and Trainer's motion for summary judgment on the Werneckes' illegal search claim; we also REVERSE the order's denial of summary judgment on the illegal seizure claim as to Trainer. However, we AFFIRM the order's denial of summary judgment on the illegal seizure claim as to Garcia, and we REMAND for further proceedings consistent with this opinion.