# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 8, 2019

Lyle W. Cayce
Clerk

No. 18-20486

—————

BARBARA MARKS; JLF, a Minor; GWF, a Minor; GJH, a Minor, also known as GJR,

> Plaintiffs - Appellees

v.

WANDA HUDSON; DEAUC DENTAEN,

> Defendants - Appellants

—————

Appeal from the United States District Court
for the Southern District of Texas

—————

Before OWEN, SOUTHWICK, and HIGGINSON, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

A mother and her three minor children sued two employees of the state's child protective services agency. They claimed a violation of the constitution stemming from the defendants' taking of the three children from their mother's custody under a temporary removal order. The district court denied the defendants' motion to dismiss the claims based on qualified immunity. The defendants brought an interlocutory appeal. We conclude the defendants were entitled to qualified immunity because there was no constitutional violation. We REVERSE and REMAND in order to dismiss the suit.

No. 18-20486

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff Barbara Marks is the mother of plaintiffs JLF, GWF, and GJH, who are minors. William Farmer is the father of JLF and GWF. Raymond Hlavaty, III is GJH's father. Apparently, neither father lives with Marks or the children. Before the events giving rise to this suit, there were two reports to the Texas Department of Family and Protective Services ("Protective Services") of neglectful supervision made against Marks. Both reports were later "ruled out" by Protective Services. GWF was allegedly difficult to control and occasionally exhibited outbursts of anger.

On December 13, 2015, GWF called the police to report that Marks hit him in the eye. The next day, Protective Services received a referral of physical abuse due to bruising on GWF's eye. Marks' complaint in this suit alleges that she did not hit GWF, but rather he slipped while throwing a "temper tantrum" as Marks was attempting to remove him from the baby GJH's room. Defendant Wanda Hudson, a Protective Services employee, was assigned to the case. The complaint alleges that JLF told Hudson that the bruise was the result of an accident. Defendant Deauc Dentaen was Hudson's supervisor at the time.

On December 15, 2015, Hudson ordered Marks to release GWF to his father while Marks enrolled in counseling for six months. Marks refused. In an affidavit filed in the District Court of Harris County, Texas, Hudson stated that she interviewed GWF at school, and that GWF claimed Marks "hit him in the eye after saying he better find his review paperwork for school." On December 16, Marks allowed GWF to be with his father "for a couple of days," but was adamant that GWF could not stay there long "because [the] father was unable to take care of GWF properly considering the problems GWF has." On December 18, Marks permitted GWF's father to take him for a doctor's appointment, but then she picked GWF up from that appointment.

2

No. 18-20486

That same day, Hudson went to Marks' residence, but no one answered the door. Hudson in an affidavit swore someone was at home and that she saw a light in the home being turned off. Marks claims she did not answer because she had left to go to a theater. Marks claims Hudson was aware Marks was not home and lied about seeing a light being turned off.

On December 21, a state judge entered temporary *ex parte* removal orders for the children, based on the Hudson affidavit filed that same day. There was an adversary proceeding on February 10, 2016. The evidence was Hudson's affidavits and testimony from Hudson's supervisor Dentaen. The court ordered both GWF and JLF to live with their father while the baby GJH was sent to live with foster parents. The children were returned to Marks on April 22, 2016.

The plaintiffs brought suit in the district court for the Southern District of Texas on December 19, 2017. In their current complaint, the plaintiffs claim violations of their Fourteenth Amendment right to family integrity and their right to be free from "judicial deception," which they argue arises under the Fourth and Fourteenth Amendments. Marks brought only Fourteenth Amendment claims, while the children brought both Fourteenth Amendment and Fourth Amendment claims.

The defendants moved to dismiss the claims on April 30, 2018, based on qualified immunity, absolute immunity, and failure to state a claim upon which relief could be granted. On June 28, 2018, the district court denied the motion to dismiss. It held that the complaint sufficiently asserted a violation of clearly established law recognizing a right to family integrity by giving false evidence to support removal of the children. The defendants timely appealed.

3

No. 18-20486

DISCUSSION

A defendant may appeal a district court's denial of a motion to dismiss based on qualified immunity to the extent the alleged error is one of law. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). Our review is *de novo*, which means the well-pleaded facts in the complaint are considered to be true, with all inferences in favor of the plaintiff. *Id.* State "officials enjoy qualified immunity to the extent that their conduct is objectively reasonable in light of clearly established law." *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc)).

The defendants argue there is no actionable right to "familial association," that there was no violation of the "nebulous due process right to 'family integrity,'" and that the complaint fails to allege judicial deception sufficient to claim a violation of the Fourth or Fourteenth Amendments. They also argue they are entitled to qualified immunity because the "nebulous" rights on which the plaintiffs rely are not clearly established, nor were their actions objectively unreasonable. Finally, Dentaen alone argues that he is entitled to absolute immunity for his testimony.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity therefore has two components: "whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). We start with whether plaintiffs alleged an actionable constitutional violation.

*I.    The Existence of a Constitutional Right*

The defendants argue there is no constitutional right to "familial association," and that the closest analogue is a "nebulous" due process right to "family integrity." The defendants also argue that the other allegations cast as Fourteenth Amendment claims concern a due process Fourth Amendment violation for withholding evidence. We will survey the legal landscape for familial rights to determine what is actionable.

The federal constitution protects the right to "family integrity," which is characterized as a "form of liberty guaranteed by the due process clause of the Fourteenth Amendment," including the "rights to conceive and to raise one's children" and to maintain the "integrity of the family unit." *Morris v. Dearborne*, 181 F.3d 657, 666-667 (5th Cir. 1999) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). This right can also be described as "the right of the family to remain together without the coercive interference of the awesome power of the state." *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988) (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)). The right is not absolute. "States can adopt necessary policies to protect the health, safety, and welfare of children." *Morris*, 181 F.3d at 669. Even so, some procedural due process must be provided before parents are deprived of their liberty interest in the custody and management of their child. *See Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982).

Over the last fifteen years or so, we have addressed different issues relevant to familial rights. We held that the Fourth Amendment regulates social workers' civil investigations but did not establish "the relevant Fourth Amendment standards" that would apply. *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 401 (5th Cir. 2002). We cited cases from other circuits that had held that when parents' claims mirror a child's Fourth Amendment seizure claim, the same "procedures required for a constitutional

5

search and seizure under the Fourth Amendment are adequate to protect [parents'] procedural due process rights and liberty interest in directing the upbringing of their children." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).

We dated one aspect of the clarity in our law by holding that "[a]s of June 1, 2005, Fifth Circuit precedent clearly established that the Fourth Amendment governs social workers' investigations of allegations of child abuse." *Wernecke v. Garcia*, 591 F.3d 386, 399-400 (5th Cir. 2009). A panel of the court determined that we had clearly established that "[g]overnment officials may neither permanently terminate parental rights, nor temporarily remove children from their parents, without affording the parents due process of law." *Stewart v. Perry*, 369 F. App'x 593, 594 (5th Cir. 2010) (citing *Morris*, 181 F.3d at 669-72, for the proposition that it is a violation of the Fourteenth Amendment to seize a child even temporarily without due process of law). Finally, one panel stated that it was clearly established that social workers can violate the Fourth Amendment by "'knowingly and intentionally, or with reckless disregard for the truth,' mak[ing] a false statement or omission that results in the issuance of a warrant without probable cause." *Wernecke v. Garcia*, 452 F. App'x 479, 483 (5th Cir. 2011) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) and citing *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir.1990) (applying *Franks* to omissions)).

Because nonprecedential opinions do not establish any binding law for the circuit, *Light-Age, Inc. v. Ashcroft-Smith*, 922 F.3d 320, 322 n.1 (5th Cir. 2019), they cannot be the source of clearly established law for qualified immunity analysis. Certainly, though, to the extent any of those opinions are restating what was clearly established in precedents they cite or elsewhere, the unpublished opinions can properly guide us to such authority. It is clearly established that Fourth Amendment procedures and standards apply to social

workers' investigations. *Wernecke*, 591 F.3d at 399-400. Process that satisfies Fourth Amendment standards is adequate to protect parents' Fourteenth Amendment liberty interest in their child's custody. *Gates*, 537 F.3d at 435. It is also clearly established that a constitutional violation occurs if an official makes a knowing, intentional, or reckless false statement or omission that causes the issuance of a warrant without probable cause that leads to the removal of a child from its parent's custody. *See Franks*, 438 U.S. at 155-56.

The necessity of candor and completeness in an affidavit involves more than the rights of the person targeted by the statements. "Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberate or reckless false statement, were to stand beyond impeachment." *Id.* at 165.

All this means that an actionable Fourteenth Amendment claim exists for a false affidavit submitted to a court for the purpose of obtaining a child seizure order. The Fourteenth Amendment right alleged by the mother, Marks, is equivalent to her children's Fourth Amendment seizure claims.

We next analyze whether the plaintiffs have alleged a Fourth Amendment violation.

II.   *Constitutional Violation*

A.   *Evidentiary Standard for Emergency Order*

The Texas legislature has required the following findings be made before a magistrate may "issue a temporary order for the conservatorship of a child under Section 105.001(a)(1) or a temporary restraining order or attachment of a child authorizing a governmental entity to take possession of a child in a suit brought by a governmental entity:"

7

No. 18-20486

(1) there is an immediate danger to the physical health or safety of the child . . . and that continuation in the home would be contrary to the child's welfare;

(2) there is no time, consistent with the physical health or safety of the child . . . for a full adversary hearing . . . ; and

(3) reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to prevent or eliminate the need for the removal of the child.

TEX. FAM. CODE ANN. § 262.102 (a) (West 2015).  The provisions of Texas law concerning the seizure of a child under Section 262.102 "would have sufficed to meet the 'warrant' requirement." *Gates*, 537 F.3d at 429 n.16.

No evidentiary standard is specified, such as probable cause or preponderance of the evidence, either in what we have quoted from Section 262.102 or in the remainder of that statute.  A preceding section of the Family Code provides potentially useful text.  It lists the same findings as Section 262.102 in the context of setting out the required contents of the affidavit that a social worker must submit when petitioning for an emergency removal order.  Section 262.101 says that the affidavit must "stat[e] facts sufficient to satisfy a person of ordinary prudence and caution" that the listed conditions exist.  *See In re E.C.R.*, 402 S.W.3d 239, 247 (Tex. 2013) (describing the process established by §§ 262.101-02).

Whatever questions might be raised by this statutory language, the parties here argue the case solely on the basis of whether an affidavit without fabrications or omissions would have supported probable cause.  For purposes of this appeal, then, we will do the same.

### B.    Hudson's Affidavit

This appeal is from the district court's denial of the defendants' motion to dismiss under Rule 12(b)(6).  Our review requires us to analyze whether the

well-pled facts in the complaint, taken as true, are sufficient to constitute a plausible claim that the Fourth and Fourteenth Amendment were violated when these children were removed from their home. *See Miller*, 519 F.3d at 236. There is a constitutional violation if an affiant knowingly and intentionally, or with reckless disregard for the truth, includes in an affidavit a false statement that is necessary to the finding of probable cause, and that affidavit results in the issuance of a warrant that leads to a search or seizure. *See Franks*, 438 U.S. 155-56. There also can be a Fourth Amendment violation if there were misleading material omissions that were recklessly, intentionally, or knowingly omitted from the affidavit. *See Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006). "To determine whether facts omitted from a warrant affidavit are material to the determination of probable cause, courts ordinarily insert the omitted facts into the affidavit and ask whether the reconstructed affidavit would still support a finding of probable cause." *Id.*

In summary, we remove all plausibly claimed fabrications and insert all plausibly claimed omissions to see if the revised affidavit would have allowed — "would still support" — the magistrate's finding of probable cause.

The plaintiffs allege that Hudson lied in her affidavit that led to the seizure of the children for a period of about four months. We accept the well-pled claims of falsehoods but must decide if the asserted fabrications were necessary to the finding of probable cause for the removal of the children. *Franks*, 438 U.S. 155-56.

At the outset, we identify some significant statements in the affidavit that are not claimed to be false. These include that Hudson arrived at Marks' home on December 15 to speak with Marks; that the father, William Farmer, agreed and signed a safety plan for the care of GWF; that GWF stated that his mother hit him in the eye after saying that he needed to find review homework from school; that Protective Services requested to be temporary managing

conservator of the children due to GWF's black eye which he stated was "received from his mother"; and that Marks was instructed by her attorney not to cooperate with Protective Services. The plaintiffs fail to allege any facts to show that the above statements were false. For instance, the plaintiffs claim that GWF never stated his mother *purposefully* hit him, but they do not deny that he stated his mother hit him after saying he better find his school paperwork. Whether the child used words of intent like "purposeful," or just said his mother hit him and implied she did so as extra emphasis in the demand she just made on him, hardly matters.

The plaintiffs' allegation that Hudson "*knew* the black eye was caused by accident," in response to Hudson's claim that Protective Services requested possession of the children because of the black eye GWF stated he received from his mother, is not well-pled. It is speculation from the stated facts. *See U.S. ex rel. Willard v. Humana Health Plan of Tex.*, 336 F.3d 375, 379 (5th Cir. 2003). Similarly, the statement that Marks would not cooperate was not false because Marks told Hudson that she should only speak to Marks' attorney. Marks admits saying she would not speak to Hudson about the matter, which does not render Hudson's characterization of the situation false.

The plaintiffs also claim that the affidavit's statement that reasonable efforts were made to prevent the removal of the children was false because no efforts were made, and Marks was only told to give GWF to his father. The plaintiffs' own allegations, however, show this was not a false statement. The plaintiffs do not deny that Hudson attempted on multiple occasions to contact Marks and that Marks refused Hudson's plan for her to attend counseling. Similarly, Marks claims that the statement that she was "physically abusing her son" was false because "GWF is known to be a problem at times and out of control which was known to" Hudson and because there was "no evidence of abuse." Such evidence does not refute that GWF had a black eye, which,

contrary to Marks' assertion, could reasonably be interpreted by Hudson to be "evidence of abuse." The allegation that Hudson "knew" her statement was false is also not well-pled as it is simply a claim. *See id.* GWF's prior instances of behavioral problems do not bear on the alleged conduct of Marks.

There are some potentially false statements. The plaintiffs allege Hudson falsely swore she saw a light being turned off at Marks' home as evidence that whoever was there ignored Hudson's knocking at the door. They also allege that Hudson's statement that there was an agreement to allow GWF to reside with his father was false because Marks was adamant throughout the process that GWF could not stay more than a few days with the father. The plaintiffs also allege that Hudson's statement that the injury was serious was false because a doctor determined that the injury was not.

Probable cause does not turn on those allegedly false allegations. GWF's claim that his mother hit him is the key fact. Hudson's allegedly knowing no one was home when she tried to visit at most supported interference with the investigation, as does the claim that Marks made an agreement to allow GWF to remain with his father then recanted. Furthermore, the relevant fact for the issuing magistrate was disclosed concerning GWF's residing with his father: Marks refused to allow GWF to reside there temporarily. The characterization of the injury as "serious" does not matter for the purposes of probable cause because Hudson disclosed in the affidavit that the injury was a swollen black eye, permitting the magistrate to determine whether it was serious or not. The affiant's individual characterization of the injury can hardly be considered a "material" fact given that the injury itself was disclosed in the affidavit. Removing these supposedly false statements does not undermine the finding of probable cause.

We now turn to what was omitted. Hudson did not include in her affidavit that she had talked to one of the other children, JLF, and that the

child had said the bruise was the result of an accident stemming from GWF's temper tantrum. Hudson also did not include in her affidavit that a doctor determined the injury was not "serious." There was no mention in the affidavit of GWF's prior behavioral problems. Finally, the affidavit did not include that the father, Farmer, told an officer that the injury was an accident.

Having dealt with the claimed fabrications, we now add the claimed omissions into what was properly before the magistrate. We then decide if the additions affect a finding of probable cause. *Kohler*, 470 F.3d at 1113. A complete affidavit would have stated that GWF called law enforcement concerning his black eye; Protective Services received a referral for physical abuse; and Marks was uncooperative, refusing to enroll in counseling. Marks also had allowed GWF to be with his father for a short period of time, but then took GWF back to her residence, refusing to allow that child to stay at his father's home any longer. The affidavit would note that GWF had previously had behavioral problems and that a doctor stated the injury was not serious. The affidavit would also include a statement that JLF and Farmer stated that the injury was the result of an accident.

Having reconstructed the affidavit, we find there still are statements that support the existence of an immediate danger to GWF. The plaintiffs do not refute that GWF actually told Hudson that his mother hit him in the eye; the plaintiffs only contest whether he told her it was purposeful. Even if the injury was disclosed as not being serious, these assertions still support that the danger to GWF was not in the specific injury but in Marks' willingness to strike GWF. Including that child's history of behavioral problems would not eliminate probable cause, as the issue was how his mother responded to the challenges he presented to her. Adding in the omission that JLF and Farmer provided an alternative explanation to Hudson and to a police officer, the affidavit still would state that GWF called the police and told Hudson he was

struck by his mother, which would support that it was in GWF's best interest to remove him from the home until the adversarial hearing could adequately test the claims of other witnesses.

The reconstructed affidavit also would support that reasonable efforts were made to provide for the safety of the child while preventing the child's removal, given the discussion in the affidavit of Marks' refusal to attend counseling sessions and Marks' own concession that she did refuse. § 2262.102(a)(3).[1]  Other evidence in the affidavit that was not refuted by the plaintiffs is that Hudson attempted on multiple occasions to speak with Marks. Reviewing the reconstructed affidavit, we find that there was an adequate basis for the issuance of the temporary conservatorship order, and therefore there was no Fourth Amendment violation based on Hudson's affidavit.

### C.    Dentaen's Testimony

The plaintiffs also challenge Dentaen's testimony at the February adversarial hearing as violating the Fourteenth Amendment: "a conviction obtained through [the] use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S 264, 269 (1959).  We assume in our analysis that this constitutional right is clearly established in the context of a hearing regarding the state taking custody of a child.

The plaintiffs must allege facts to support that Dentaen falsely testified at the adversarial hearing.  The plaintiffs allege only that Dentaen testified to what was in the affidavit.  The plaintiffs do not allege any specific facts but only their conclusions that (1) he "had personal knowledge" that GWF's eye

---

[1] Neither party discusses whether there was time for a hearing based upon the allegations in the affidavit.

injury was not serious and due to an accident when he testified that GWF's eye injury was serious, and (2) that he had knowledge of the allegedly false statements in the affidavit but approved them.

Because there is no vicarious liability for supervisors for the conduct of their subordinates, the claim against Dentaen fails absent well-pled allegations of his personal involvement or some other form of causation to connect the supervisor to the violation. *Rios v. City of Del Rio*, 444 F.3d 417, 425-26 (5th Cir. 2006). At most, the complaint makes unwarranted conclusions about a defendant's actual knowledge. This claim was properly dismissed.

We REVERSE and REMAND with instructions to dismiss the suit.